Bruce SNOW, Appellant–Petitioner,

v.

Anita R. (Snow) RINCKER, Appellee–Respondent.

No. 48A02–0402–CV–137.

Court of Appeals of Indiana.

March 22, 2005.

Transfer Denied June 14, 2005.

D. Eric Hall, Anderson, IN, Attorney for Appellant.

David W. Stone, IV, Anderson, IN, Attorney for Appellee.

## OPINION

BAKER, Judge.

"Poverty is no disgrace to a man, but it is confoundedly inconvenient." Sydney Smith, from *His Wit and Wisdom.* To-day, appellant-petitioner Bruce Snow brings four issues before us, which we consolidate and restate as: (1) whether the trial court abused its discretion by ordering Snow to pay a portion of his twenty-year-old daughter Meghan's college expenses; (2) whether the trial court abused its discretion by including certain expenses as educational expenses; and (3) whether the trial court erred in refusing to order appellee-respondent Anita Rincker—Snow's former spouse—to pay a portion of the college expenses. While it was within the discretion of the trial court to order Snow to help pay for Meghan's higher education expenses, the trial court abused its discretion in making this award because it reduces Snow to the confoundedly inconvenient state of poverty. Finding no other error, we affirm in part, reverse in part, and remand for a recalculation of Snow's obligation with regard to Meghan's higher education expenses.

### FACTS

Snow and Rincker were married and had one child, Meghan, who was born on October 4, 1982. The parties divorced in August 1985, and the trial court's order required Snow to pay $75.00 a week in support, maintain life insurance for Meghan, provide health insurance for Meghan, and pay health expenses over $30.00. The order did not require Snow to pay Meghan's college expenses. Snow works as an estimator at a body shop and earns $41,700 a year, and he is not remarried. Rincker is remarried and earns approximately $28,900 a year. Thus, Rincker earned 41% and Snow earned 59% of the parties' combined income.

Meghan is an excellent student who attended the Indiana Academy at Ball State University, which is an honors program for qualified high school students. After high school, she attended Saint Louis Uni-

versity with a major in Health Information Management. This course of study is offered at only a limited number of universities throughout the country. As an undergraduate, Meghan received a partial scholarship in the amount of $5,100 per semester. Snow did not contribute to Meghan's educational expenses during her first three years at Saint Louis University. Instead, Rincker borrowed $50,000 to pay for Meghan's first three years of college, and Meghan incurred $11,000 in student loans and was employed in a work/study program at school for fifteen hours a week.

Meghan was a senior at Saint Louis University during the 2003–2004 year. The tuition for the 2003–2004 school year was $22,050, reduced by the scholarships of $10,200. Thus, Meghan's total expenses for the 2003–2004 school year, including tuition not covered by scholarships, room and board, parking, student fees, books, car insurance, gasoline, license plates, school supplies, utilities, cell phone payment, and clothing, were estimated at $26,549.

Meghan wants to pursue a Masters degree in Health Administration during the 2004–2005 school year and an accelerated nursing degree during the summer of 2005 and the 2005–2006 school year. Meghan will not be eligible for a scholarship while participating in the masters program or the accelerated nursing degree program. Meghan anticipates that tuition for the 2004–2005 school year will be $41,400, tuition for the summer of 2005 will be $6,225, and tuition for the 2005–2006 school year will be $14,940. Meghan further anticipates that her expenses for room, board, books, and other miscellaneous expenses will remain the same as previous years. Thus, the anticipated total cost for the 2004–2005 school year is $56,026, the cost for the summer of 2005 is $13,511, and the

cost for the 2005–2006 school year is $29,548.

In August 2003, Rincker filed a petition requesting that Snow "be responsible for his proportionate share of [Meghan's] higher education expenses." Appellant's App. p. 5. At a hearing on the matter, Rincker also argued that Snow was in contempt for failing to provide health insurance to Meghan, failing to make weekly deposits into a savings account for Meghan, and failing to maintain the $50,000 life insurance policy for Meghan. After a hearing, the trial court entered the following order:

> The Court clears [Snow] of any contempt in this matter for two reasons[:] (1) That [Rincker] failed to petition the court for citation until this late date and secondly that the violations are minor. (2) In regard to the petition to modify for a portion of [Meghan's] higher education expenses, the Court orders [Snow] to pay Fifty Nine Percent (59%) of [Meghan's] school expenses at St. Louis University for the year 2003 to 2004.

> The expenses are Twenty Six Thousand Five Hundred Forty Nine Dollars and Thirty Eight Cents ($26,549.38) and Fifty Nine Percent (59%) of said expenses is the sum of Fifteen Thousand Six Hundred Sixty Four Dollars and Thirteen Cents ($15,664.13). This payment shall be made within a period of Ninety (90) days.

> Further the Court orders [Snow] to pay for the following two (2) years 2004 to 2005 and 2005 to 2006. The Court orders [Meghan] to be responsible for one-third (1/3) or her college expenses and [Snow] to be responsible for Fifty Nine Percent (59%) of the expenses over and above the one-third (1/3) and to be payable at the rate of One Hundred Dollars ($100.00) per week. First pay-

ment commencing at the time of [Meghan's] enrollment and acceptance at the University.

The Court further finds that [Meghan] is emancipated and that the support of Seventy Five Dollars ($75.00) per week is hereby terminated.

Each party is to pay their own attorney fees.

Appellant's App. p. 3–4. Snow now appeals.

## DISCUSSION AND DECISION

### I. Payment of Higher Education Expenses

■ Snow first argues that the trial court erred in ordering him to pay Meghan's educational expenses. Specifically, he contends that his income is insufficient to pay the court-ordered portion of Meghan's expenses and that his contribution should have been capped based upon costs at a level consistent with the tuition and costs at a state-supported university or college in Indiana.

■ Our supreme court has held "when the apportionment of college expenses is at issue, the clearly erroneous standard ... governs appellate review." *Carr v. Carr,* 600 N.E.2d 943, 945 (Ind.1992). "When the decision to order the payment of extraordinary educational expenses is challenged, however, review should continue to be for abuse of discretion." *Id.* Here, Snow challenges the trial court's decision to order the payment of extraordinary educational expenses. Thus, under *Carr,* we review the trial court's order for an abuse of discretion. As a result, "[r]eversal is appropriate only if we find the trial court's decision is against the logic and effect of the facts and circumstances before the Court or the reasonable inferences drawn therefrom." *In re B.H.,* 770 N.E.2d 283, 288 (Ind.2002).

■ "Although a parent is under no absolute legal duty to provide a college education for his children, a court may nevertheless order a parent to pay part or all of such costs when appropriate." *Claypool v. Claypool,* 712 N.E.2d 1104, 1109 (Ind.Ct.App.1999), *trans. denied.* Ind. Code § 31–16–6–2 (1998) governs educational support and provides:

(a) The child support order or an educational support order may also include, where appropriate:

(1) amounts for the child's education in elementary and secondary schools and at institutions of higher learning, taking into account:

(A) the child's aptitude and ability;

(B) the child's reasonable ability to contribute to educational expenses through:

(i) work;

(ii) obtaining loans; and

(iii) obtaining other sources of financial aid reasonably available to the child and each parent; and

(C) the ability of each parent to meet these expenses;

(2) special medical, hospital, or dental expenses necessary to serve the best interests of the child; and

(3) fees mandated under Title IV–D of the federal Social Security Act (42 U.S.C. 651 through 669).

(b) If the court orders support for a child's educational expenses at an institution of higher learning under subsection (a), the court shall reduce other child support for that child that:

(1) is duplicated by the educational support order; and

(2) would otherwise be paid to the custodial parent.

Further, the commentary to Ind. Child Support Guideline 6 addresses educational

support and provided the following at the time of Rincker's petition and the hearing: [1]

Extraordinary educational expenses may be for elementary, secondary or post-secondary education, and should be limited to reasonable and necessary expenses for attending private or special schools, institutions of higher learning, and trade, business or technical schools to meet the particular educational needs of the child.

\* \* \* \* \*

b. Post–Secondary Education. The authority of the Court to award post-secondary educational expenses is derived from IC 31–16–6–2. It is discretionary with the court to award post-secondary educational expenses and in what amount. In making such a decision, the court should consider post-secondary education to be a group effort, and weigh the ability of each parent to contribute to payment of the expense, as well as the ability of the student to pay a portion of the expense.

If the Court determines that an award of post-secondary educational expenses is appropriate, it should apportion the expenses between the parents and the child, taking into consideration scholarships, grants, student loans, summer and school year employment and other cost-reducing programs available to the student. These sources of assistance should be credited to the child's share of the educational expense.

\* \* \* \* \*

The court may limit consideration of college expenses to the cost of state supported colleges and universities or otherwise may require that the income level of the family and the achievement level of the child be sufficient to justify the expense of private school.

Child.Supp. G. 6, commentary. "In determining whether to order either or both parents to pay sums toward their child's college education, the court must consider whether and to what extent the parents, if still married, would have contributed to the child's college expenses." *Neudecker v. Neudecker*, 577 N.E.2d 960, 962 (Ind. 1991).

The trial court ordered Snow to pay 59% of the $26,549.38 cost of Meghan's schooling for the 2003–2004 school year, or $15,664.13. Snow points out that this amount is 37% of his annual income of $41,704. As for the 2004–2005 school year and the 2005–2006 school year, the trial court ordered Meghan to pay 33% of the cost and Snow to pay 59% of the remainder at the rate of $100 per week. This amounts to a total cost to Snow of $22,037 for the 2004–2005 school year, $5,314 for the summer of 2005, and $11,622 for the 2005–2006 school year. Snow argues that the cost of Meghan's college expenses at Saint Louis University is beyond his ability to pay. He contends that his contribution should have been capped at the costs of a state-supported university. *See Million v. Swager*, 807 N.E.2d 140 (Ind.Ct. App.2004) (upholding trial court's order to pay college expenses at Cornell University where the obligation was capped at $4,000.00 per year, which is approximately one third of the expenses at a state school, in recognition of the parents' incomes).

Although the language of Child Support Guideline 6 is optional, we agree with Snow that the trial court should have

---

**1.** The commentary to Ind. Child Support Guideline 6 was amended on Sept. 10, 2003, effective Jan. 1, 2004.

capped his contribution at the costs of a state-supported university. The order requires Snow to pay 59 percent of the balance of Meghan's college expenses. Whether or not Snow presented evidence of his expenses, it is apparent that this is a significant burden for someone who earns approximately $41,700 per year. After deducting from Snow's income for federal[2] and state[3] taxes, the order leaves Snow with approximately $18,757 during the 2003–04 school year with which he can support himself.[4] The situation only worsens in the 2004–05 school year and 2005 summer session, when his obligation increases to $27,351. Assuming Snow's gross pay remains relatively static, this portion of the order requires Snow to pay approximately 79 percent of his gross wages[5] for that school year toward Meghan's higher education expenses, leaving him with a mere $7,070 on which he can live. This is well below the 2004 poverty level for a one-person household of $9,827 per year.[6] It was an abuse of discretion for the trial court to plunge a father into poverty to pay for a degree that could be earned at a less expensive, state-supported university. Because the order requires Snow to pay such an excessive portion of his gross income for Meghan's schooling, it appears that perhaps the trial court was trying to "even the playing field," consid-ering Rincker had incurred $50,000 in prior loans for Meghan's schooling while Snow had not contributed to her higher education expenses. If that is the case, we cannot condone an order of "makeup payments," especially considering Rincker did not request of the trial court that Snow contribute to Meghan's higher education expenses until shortly before her twenty-first birthday.

Even though the trial court ordered Snow to pay the 2004–05 and 2005–06 expenses at the rate of $100 per week, the order required Snow to pay the 2003–04 expenses of $15,664.13 in a lump sum. The lump sum in addition to the enormity of the percentage of Snow's salary that is in question leads us to conclude that we must reverse the order of the trial court on this issue.

## II. Certain Expenses Included as Educational Expenses

Snow next contends that the trial court erred in not defining the terms "school expenses" and "college expenses" in its order. Specifically, he argues that his obligation should not be calculated to include certain expenses, such as car payments, parking, car insurance, gasoline, license plates, utilities, clothing, and a cell phone.

■ We note that the trial court has discretion to determine what is included in

**2.** The 2003 federal tax rates for an individual are 10% on the first $7,000 of income, 15% on income between $7,000 and $28,400, and 25% on income between $28,400 and $68,800. This yields an approximate tax of $6,023 on $41,700 of annual income assuming that Snow uses only the standard deduction of $4,750. Internal Revenue Service, "Revised 2003 Tax Schedule Rates" at http://www.irs.gov/formspubs/article/0,,id=109877,00.html (last visited February 24, 2005).

**3.** The 2003 Indiana tax rate for individuals is 3.4% for all taxable income. This yields an approximate tax of $1,256 on $36,950 (his federal adjusted gross income) of income. Indiana Department of Revenue, "2003 IT–40 Form" at http://www.in.gov/dor/taxforms/03pdfs/03–it40frm.pdf (last visited February 28, 2005).

**4.** $15,664 + 1,256 + 6,023 = 22,943$; $41,700 — 22,943 = 18,757$.

**5.** $22,037 + 5,314 = 27,351$; $41,700 — 6,023 — 1,256 = 34,421$; $27,351 / 34,421 = 79.46\%$

**6.** U.S. Census Bureau, "Poverty Thresholds 2004" at http://www.census.gov/hhes/poverty/threshld/ thresh04.html (last visited February 28, 2005).

educational expenses. *Warner v. Warner,* 725 N.E.2d 975, 979 (Ind.Ct.App.2000). The commentary to Ind. Child Support Guideline 6 gives guidance on items included in educational expenses and provides:

> A determination of what constitutes educational expenses will be necessary and will generally include tuition, books, lab fees, supplies, student activity fees and the like. Room and board will also be included when the student resides on campus or otherwise is not with the custodial parent.

In discussing the post-secondary education worksheet, the commentary also provides that the trial court "may wish to consider in the category of 'Other' educational costs (Line B(5) of the Worksheet) such items as transportation, car insurance, clothing, entertainment and incidental expenses." *Id.*

Initially, we note that Meghan's car was "paid off," and the trial court did not order Snow to pay any expense related to a car payment. Exhibit B. All of the other expenses of which Snow complains fit squarely within the definition of "Other" education expenses that the trial court may consider. Even though the trial court was not required to consider these expenses, we cannot say that it was an abuse of discretion to do so. As for Snow's contention that "school expenses" and "college expenses" were not specifically defined, the trial court relied upon Respondent's Exhibit B, which contains an itemized list of Meghan's expenses, in fashioning its order. Thus, the items included within school expenses or college expenses were sufficiently identifiable.

### III. *Failing to Order Rincker to Contribute*

 Finally, Snow avers that the trial court erred in failing to require Rincker to pay her proportionate share of Meghan's educational expenses. Specifically, he contends that the trial court specifically stated his and Meghan's obligations in the order, but abused its discretion by failing to spell out Rincker's obligation.

 When assessing a challenge to the language of a judgment, we will read the judgment's provisions together in order to render the judgment effective. *Brown v. Brown,* 581 N.E.2d 1260, 1263 (Ind.Ct.App.1991). In so doing, we may look at the entire record, including, but not limited to, the complaint, findings, and evidence to ascertain the judgment's meaning and effect. *Id.* "Given the presumption that a trial court intended its judgment to be valid and not void . . ., we will liberally construe the trial court's judgment to make it serviceable, not useless." *Otto v. Park Garden Assoc.,* 612 N.E.2d 135, 140 (Ind.Ct.App.1993), *trans. denied.*

While it is true that the trial court's order does not specifically mention Rincker, it implies that she is required to pay the remaining 41% of Meghan's expenses that are not covered by scholarships or allocated to Snow or to Meghan. This is a reasonable interpretation of the judgment, and we find no merit to a claim of error based on this issue.

### CONCLUSION

In light of the above conclusions, we find that the trial court erred in ordering Snow to pay so much of Meghan's higher education expenses. We further find that the definition of "school expenses" and "education expenses" was easily ascertainable and included appropriate items. Finally, we find that the trial court's order impliedly requires Rincker to pay any education expenses that are not covered by scholarship or allocated to Snow or to Meghan.

The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions to cap Snow's expenses based upon costs consistent with

tuition and costs at a state-supported university.

FRIEDLANDER, J., concurs.

SHARPNACK, J., concurring in part and dissenting in part.

SHARPNACK, Judge, concurring in part and dissenting in part.

I respectfully concur in part and dissent in part. I agree that the trial court did not abuse its discretion by including certain expenses as educational expenses and that the trial court did not err by failing to specifically order Rincker to pay a portion of the education expenses. However, I disagree that the trial court abused its discretion by ordering Snow to pay a portion of Meghan's expenses at St. Louis University.

Snow argues that the cost of Meghan's college expenses at St. Louis University is beyond his ability to pay and that his contribution should have been capped at the cost of state-supported school. I disagree for two reasons. First, my review of the record reveals little about Snow's financial status except that Snow makes $41,700 and is not married. Snow presented no evidence of his expenses, tax burdens, or the poverty level and presented no factual basis for us to determine that the trial court's order is an abuse of discretion. Other than his assertions that the expense of Meghan's college is excessive, Snow has made no showing of an unacceptable economic burden. Further, the trial court took Snow's ability to pay into consideration by ordering him to pay the graduate school expenses at the rate of $100.00 per week rather than in a lump sum.

Second, although the commentary to Ind. Child Support Guideline 6 provides that the trial court "*may* limit consideration of college expenses to the cost of state supported colleges and universities or otherwise may require that the income level of the family and the achievement level of the child be sufficient to justify the expense of private school," the commentary does not mandate that the trial court limit the expenses to the cost of state schools. Child.Supp. G. 6, commentary (emphasis added). While the limitation of college expenses to the cost of a state school may be reasonable in particular circumstances, *see Million,* 807 N.E.2d at 145, it is not a benchmark. Rather, the particular circumstances of the case must be considered.

Here, Meghan is an exceptional student, and her particular course of study is offered only at a limited number of colleges in the United States. Further, Snow offered nothing regarding his financial status other than his gross income to establish what a burden Meghan's college expenses at St. Louis University might be. Thus, while limiting college expenses to the cost of a state school, as the trial court did in *Million,* may be an acceptable resolution in some circumstances, I cannot conclude under the circumstances presented in the record before us that the trial court abused its discretion by choosing to do otherwise. Consequently, I respectfully concur in part and dissent in part.